CITY OF ALLIANCE, Appellee,

v.

CARBONE, Appellant.

[Cite as *Alliance v. Carbone*, 181 Ohio App.3d 500, 2009-Ohio-1197.]

Court of Appeals of Ohio,
Fifth District, Stark County.

No. 2008–CA–00057.

Decided March 16, 2009.

502

Andrew L. Zumbar, Alliance Law Director, and Jennifer Arnold, Assistant Prosecuting Attorney, for appellee.

Mark Whitaker, for appellant.

***

DELANEY, Judge.

{¶ 1} Defendant-appellant, Mark Carbone, appeals from his conviction of one count of disorderly conduct in violation of Alliance Municipal Ordinance ("A.M.O.") 941.06(h) for loitering in or near a toilet building. The city of Alliance is plaintiff-appellee.

## STATEMENT OF THE CASE AND FACTS

{¶ 2} On September 12, 2007, Lieutenant William Morris of the Alliance Police Department was working a sting operation in the restroom area of Butler–Rodman Park. The operation was a result of several complaints of lewd activity in the restrooms and on trails behind the restrooms at the park.

{¶ 3} Lieutenant Morris testified that on that day, there were no sporting activities in the park, nor were there any reunions or gatherings at the park. He first observed appellant's car around 1:00 p.m. when he was sitting in an

unmarked car just north of the restrooms on the west side of the park. Lieutenant Morris first observed appellant as appellant drove by in his car. According to Lieutenant Morris, appellant looked at him and nodded. Lieutenant Morris nodded back as appellant drove past him. He looked in his side mirror and observed appellant slow down his car and pump his brakes repeatedly. He testified that the pumping of brakes is one of the signals that people use when they are interested in getting together with each other in a park.

{¶ 4} Lieutenant Morris exited his car and entered the bathroom, which had a "No Loitering" sign near the entrance. As he entered the bathroom, appellant drove his car around the parking lot and parked his car perpendicular to the painted lines, as Lieutenant Morris had.

{¶ 5} Lieutenant Morris stated that he was in the restroom approximately two minutes before appellant entered the restroom. When appellant entered the restroom, he immediately went to a stall and urinated. After leaving the stall, the two men engaged in a brief conversation, and appellant asked Lieutenant Morris, "What's going on?" Lieutenant Morris responded, "Nothing much," and the two men walked out together. Lieutenant Morris then asked appellant, "Are you looking to get together?" to which appellant hesitated and responded, "Sure."

{¶ 6} Lieutenant Morris then furthered the conversation by asking, "Here in a restroom or would you like to go into the woods?" Lieutenant Morris testified that that is normally what occurs. Appellant responded, "No, it's too risky." According to Lieutenant Morris, appellant then said, "I own a business down the road." Lieutenant Morris then offered to follow appellant to the business, and appellant agreed and gave him directions to the business. At that point, Lieutenant Morris identified himself as an undercover police officer and arrested appellant pursuant to A.M.O. 941.06(h) for disorderly conduct for loitering in or near a toilet building.

{¶ 7} On February 13, 2008, appellant challenged the constitutionality of the statute, arguing that the law was unconstitutionally void for vagueness and that it was overbroad. On that same day, the trial court denied his motion. Appellant exercised his right to trial on February 14, 2008, and a jury found him guilty of disorderly conduct.

{¶ 8} Appellant raises three assignments of error:

{¶ 9} "I. Alliance Municipal Ordinance 941.06(H) violates the due process clause of the Fourteenth Amendment of the United States Constitution, and Section 1 Article 1 of the Ohio Constitution, because it is unconstitutionally void for vagueness by failing to give fair notice of the proscribed conduct and failing to set forth minimum standards to prevent arbitrary enforcement of the law.

{¶ 10} "II.   Alliance Municipal Ordinance 941.06(H) violates the due process clause of the Fourteenth Amendment to the U.S. Constitution, and Section 1 Article 1 of the Ohio Constitution because it is overbroad and adversely impacts the rights of association and free speech encompassed within the First amendment.

{¶ 11} "III.   Appellant's conviction for one count of disorderly conduct in the parks is against the manifest weight of the evidence."

### ·I & II

{¶ 12} In appellant's first and second assignments of error, he challenges the constitutionality of A.M.O. 941.06(h), arguing that it is both vague and overbroad and therefore violates the Due Process Clause of both the U.S. and Ohio Constitutions.

{¶ 13} Statutes enjoy a strong presumption of constitutionality, and a party seeking to have a statute declared unconstitutional must prove its unconstitutionality beyond a reasonable doubt.   *In re Brayden James,* 113 Ohio St.3d 420, 2007-Ohio-2335, 866 N.E.2d 467, at ¶ 13;   *State v. Anderson* (1991), 57 Ohio St.3d 168, 171, 566 N.E.2d 1224.   An appellate court's review of the constitutionality of a statute is de novo.   *State v. Cook* (1998), 83 Ohio St.3d 404, 411, 700 N.E.2d 570.

{¶ 14} "A municipality's power to pass ordinances to promote the health, safety, morals, or general welfare of the public is broad, and not subject to precise definition."   *Whitehall v. Khoury,* 10th Dist. No. 07AP–711, 2008-Ohio-1376, 2008 WL 787670, citing *Columbus v. Truax* (1983), 7 Ohio App.3d 49, 51, 7 OBR 60, 454 N.E.2d 184.   A city's police power is not unlimited, however, and a municipal ordinance " 'must not be arbitrary, discriminatory, capricious or unreasonable and must bear a real and substantial relation to the health, safety, morals or general welfare of the public.' "   Id., quoting *Cincinnati v. Correll* (1943), 141 Ohio St. 535, 26 O.O. 116, 49 N.E.2d 412, paragraph one of the syllabus.

### I. VAGUENESS

{¶ 15} In considering a challenge to an ordinance or statute as void for vagueness, a court is required to determine whether the enactment "(1) provides sufficient notice of its proscriptions to facilitate compliance by persons of ordinary intelligence and (2) is specific enough to prevent official arbitrariness or discrimination in its enforcement."   *Norwood v. Horney,* 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, at ¶ 84.   A statute is not void for vagueness simply because it could have been worded more precisely or with additional certainty. Rather, the "critical question in all cases is whether the law affords a reasonable

individual of ordinary intelligence fair notice and sufficient definition and guidance to enable him to conform his conduct to the law." Id. at ¶ 86.

{¶ 16} Appellant contends that A.M.O. 941.06(h) is void for vagueness both on its face and as it applies to him. In order to determine what constitutes loitering for the purposes of the ordinance, appellant claims that there is no guidance as to what is legal and not legal conduct, and accordingly, the law is unconstitutional as written because it reaches a wide range of innocent conduct.

{¶ 17} The freedom to loiter for innocent purposes is a recognized liberty in the United States that is protected by the Due Process Clause of the Fourteenth Amendment. *Chicago v. Morales* (1999), 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67. The Supreme Court has specifically held that this "right to remove from one place to another according to inclination" is an "attribute of personal liberty" protected by the Constitution. Id. at 1858, 119 S.Ct. 1849, 144 L.Ed.2d 67, citing *Williams v. Fears* (1900), 179 U.S. 270, 274, 21 S.Ct. 128, 45 L.Ed. 186. "[A]n individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is 'a part of our heritage.'" Id., citing *Kent v. Dulles* (1958), 357 U.S. 116, 126, 78 S.Ct. 1113, 2 L.Ed.2d 1204.

{¶ 18} "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. * * * Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. * * * Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.'" *Akron v. Rowland* (1993), 67 Ohio St.3d 374, 381, 618 N.E.2d 138.

{¶ 19} The Ohio Supreme Court has recognized that loitering and vagrancy laws "have a long and troubling history in Anglo–American jurisprudence." *Rowland,* 67 Ohio St.3d at 377, 618 N.E.2d 138. See also *State v. Griffin* (1999), 133 Ohio App.3d 490, 728 N.E.2d 1097 (courts generally disfavor loitering laws, as they have the potential to punish persons who use public streets innocently or when exercising constitutional rights). In the 1970s and 1980s, most American vagrancy laws were held unconstitutional by the United States Supreme Court, most famously in *Papachristou v. Jacksonville* (1972), 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110. In *Papachristou,* the court considered a vagrancy law that penalized "rogues and vagabonds," "dissolute persons who go about begging, common gamblers, persons who use juggling or unlawful games or plays, common drunkards, * * * persons wandering or strolling around from place to place

without any lawful purpose or object, [and] habitual loafers * * *." Id. at 156–157, 92 S.Ct. 839, 31 L.Ed.2d 110. Determining that the ordinance was vague, the court held that enforcement of the ordinance violated due process. Specifically, the court held that the Jacksonville ordinance "makes criminal activities which by modern standards are normally innocent." Id. at 163, 92 S.Ct. 839, 31 L.Ed.2d 110. The court determined that the ordinance was vague because it did not give ordinary people notice of what conduct was prohibited and because it gave the police unfettered discretion to make arrests.

{¶ 20} A decade later, the U.S. Supreme Court reaffirmed its holding in *Papachristou.* See *Kolender v. Lawson* (1983), 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903. In *Kolender,* the court declared a California statute unconstitutional that made it illegal for a person to "loiter[ ] or wander[ ] upon the streets or from place to place without apparent reason or business and * * * refuse[ ] to identify himself and to account for his presence when requested by any peace officer so to do, if the surrounding circumstances are such as to indicate to a reasonable man that the public safety demands such identification." Id. at 353, 103 S.Ct. 1855, 75 L.Ed.2d 903. The court determined that the California law gave too much discretion to police. Specifically, the court stated, "An individual, whom [sic] police may think is suspicious but do not have probable cause to believe has committed a crime, is entitled to continue to walk the public streets 'only at the whim of any police officer' who happens to stop that individual." Id. The court concluded that the statute was unconstitutionally vague because it encouraged arbitrary enforcement by "failing to describe with sufficient particularity what a suspect must do in order to" commit a violation. Id. at 361, 103 S.Ct. 1855, 75 L.Ed.2d 903.

{¶ 21} While new loitering laws are more narrowly tailored than the older vagrancy laws, as the Ohio Supreme Court has stated, "This generation of loitering ordinances, however, sought 'to wrap the same unconstitutional law in a prettier package that was more likely to receive judicial sanction.'" *Rowland,* 67 Ohio St.3d at 379, 618 N.E.2d 138, quoting Comment, The Third Generation of Loitering Laws Goes to Court: Do Laws That Criminalize "Loitering With Intent to Sell Drugs" Pass Constitutional Muster? (1993), 71 N.C.L.Rev. 513, 517.

{¶ 22} In *Rowland,* the Ohio Supreme Court held that an Akron loitering ordinance was void for vagueness. That ordinance stated:

{¶ 23} "(A) No person shall loiter in or near any thoroughfare, place open to the public, or near any public or private place in a manner and under circumstances manifesting the purpose to engage in drug-related activity contrary to any of the provisions of R.C. Chapter 2925.

{¶ 24} "(B) Among the circumstances which may be considered in determining whether such purpose is manifested are:

{¶ 25} "(1) Such person is a known unlawful drug user, possessor or seller * * *;

{¶ 26} "(2) Such person is currently subject to a court order prohibiting his presence in a high drug activity geographic area;

{¶ 27} "(3) Such person behaves in such a manner as to raise a reasonable suspicion that he is about to engage in or is then engaged in an unlawful drug-related activity, including, by way of example only, such person acting as a lookout or hailing or stopping cars;

{¶ 28} "(4) Such person is physically identified by the officer as a member of a gang or association which has as its purpose illegal drug activity;

{¶ 29} "(5) Such person transfers small objects or packages in a furtive fashion;

{¶ 30} "(6) Such person takes flight or manifestly endeavors to conceal himself upon the appearance of a police officer;

{¶ 31} "(7) Such person manifestly endeavors to conceal any object which reasonably could be involved in an unlawful drug-related activity;

{¶ 32} "(8) Such person possesses any instrument, article, or thing whose customary or primary purpose is for the sale, administration, or use of controlled subjects [sic] * * *;

{¶ 33} "(9) The area involved is by public repute known to be an area of unlawful drug use and trafficking;

{¶ 34} "(10) The premises involved are known to the defendant to have been reported to law enforcement as a place of drug activity pursuant to R.C. Chapter 2925;

{¶ 35} "(11) Any vehicle involved is registered to a known unlawful drug user, possessor, or seller, or a person for whom there is an outstanding warrant for a crime involving drug-related activity." Akron Codified Ordinance ("A.C.O.") 138.26.

{¶ 36} The Ohio Supreme Court held that A.C.O. 138.26 was unconstitutionally vague because the ordinance did not even require proof of the specific intent to engage in drug-related activity. The 11 circumstances in the ordinance were only "among the circumstances which may be considered." A reasonable person could not figure out what constituted innocent loitering and criminal loitering, especially because most of the circumstances listed in the ordinance are considered to be legal acts. The court determined that it was too hard to determine what a police officer would consider circumstances manifesting a purpose to engage in drug activity.

{¶ 37} In this case, A.M.O. 941.06(h) states:

{¶ 38} "No person shall loiter in or near toilet buildings."

{¶ 39} The term "loiter" is not defined anywhere in the Alliance Municipal Code. Nothing in A.M.O. 941.06(h) requires that a crime actually be committed in order to support an arrest or conviction. This law is "clearly designed to nip crime 'in the bud.'" *Rowland*, 67 Ohio St.3d at 379, 618 N.E.2d 138, quoting *Papachristou*, 405 U.S. at 171, 92 S.Ct. 839, 31 L.Ed.2d 110. A criminal statute must be reasonably clear and definite and there must be identifiable standards of guilt on which citizens, courts, and the police may rely in order for the law to comport with due process. *Rowland* at 381, 618 N.E.2d 138. "A person cannot be punished simply because the state believes that he or she is probably a criminal." Id. at 382, 618 N.E.2d 138. "It is a constitutional imperative that the dividing line between the lawful and the criminal be clear to all and not subject to conjecture." Id.

{¶ 40} Upon review, we hold that A.M.O. 941.06(h) is unconstitutionally vague on its face because it does not give people of ordinary intelligence reasonable notice to know what conduct is prohibited. "'Loitering', alone, is not a crime and cannot constitutionally be punished. 'A presumption that people who might walk or loaf or loiter or stroll or frequent houses where liquor is sold, or who are supported by their wives or who look suspicious to the police are to become future criminals is too precarious for a rule of law.'" *Rowland*, 67 Ohio St.3d at 382, 618 N.E.2d 138, quoting *Papachristou*, 405 U.S. at 171, 92 S.Ct. 839, 31 L.Ed.2d 110.

{¶ 41} "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process." (Citations omitted). *Rowland*, 67 Ohio St.3d at 383, 618 N.E.2d 138. If the average person read A.M.O. 941.06(h), he could not be sure whether having a conversation in a public bathroom would constitute criminal loitering. Accordingly, the ordinance must fail, in part, because it provides citizens with inadequate notice of what conduct is illegal.

{¶ 42} We further hold that the ordinance, as applied to appellant, is so vague that he could not reasonably know the dividing line between innocent loitering (engaging in a conversation after using the toilet facilities) and criminal loitering. Appellant drove into a park, went into the bathroom, immediately went into a stall and urinated, and then came out of the stall, where Lieutenant Morris was waiting for him and engaged him in conversation. None of these acts are per se illegal. Thus, without being able to read the officer's mind, appellant cannot be expected to know that his actions were criminal.

{¶ 43} A person who has a legitimate purpose to be in a particular place may not always be able to make that purpose known to a casual observer. "For example, a person waiting to hail a taxi, resting on a corner during a job, or stepping into a doorway to evade a rain shower has a perfectly legitimate purpose in all of these scenarios; however, that purpose will rarely be apparent to an observer." *Chicago v. Morales* (1997), 177 Ill.2d 440, 452, 227 Ill.Dec. 130, 687 N.E.2d 53, 61. " 'Merely stopping someone to talk to them cannot be characterized as hindering, obstructing, or impeding.' " *State v. Griffin* (1999), 133 Ohio App.3d 490, 497, 728 N.E.2d 1097, quoting *State v. Smith* (Dec. 23, 1993), 8th Dist. No. 64506, 1993 WL 536068. Moreover, the "Supreme Court has rejected observations of minimal public activity such as 'wandering' as too subjective to provide probable cause to arrest for a violation of a 'suspicious person' statutes." Id., citing *Columbus v. Thompson* (1971) 25 Ohio St.2d 26, 31–32, 266 N.E.2d 571.

{¶ 44} Similarly, in *Pennsylvania v. Asamoah* (Pa.Super.2002), 809 A.2d 943, the court struck down a loitering ordinance, holding that the ordinance failed to define or specify what acts demonstrated an intent to enter into an illegal drug transaction in violation of the ordinance. In *Asamoah,* the ordinance at issue prohibited a person from loitering "in any public or private place at a time, or under any circumstance or in such a manner as to: Commit acts that demonstrate an intent or desire to enter into or encourage third parties to engage in a drug transaction." Codified Ordinances of the City of York, General Offenses Code, Section 713.02.

{¶ 45} The defendant in *Asamoah* was observed standing on a public sidewalk holding money in his hand. He was standing near another person, who had his back to the police officer who made the arrest in that case. As the officer approached, the defendant turned and walked away. The person who had been standing next to the defendant walked in a different direction and threw down a plastic baggie that contained an off-white substance that was not crack cocaine. The officer and his partner circled the block in their squad car and observed the defendant on a different street, still holding money in his hand. The police officer arrested the defendant pursuant to the loitering ordinance for committing acts demonstrating an intent or desire to enter into a drug transaction. The defendant was not convicted of possessing contraband substances, nor was he observed possessing any contraband substances, according to the case.

{¶ 46} *Asamoah* held that the antiloitering ordinance provided "no guidance as to what constitutes an act demonstrating the 'intent or desire to enter into a drug transaction.' Thus, police officers are free to order any person to 'move on or disperse,' as they please, pursuant to subsection (c) of the ordinance. The ordinance, therefore, constitutes a 'vague' law because it impermissibly delegates basic policy matters to police officers for resolution on an ad hoc and subjective

basis." *Asamoah,* 809 A.2d 943 at ¶ 11. See also *People v. Bright* (1988), 71 N.Y.2d 376, 526 N.Y.S.2d 66, 520 N.E.2d 1355 (holding that a statute that merely prohibits loitering, without more, is unconstitutionally vague).

{¶ 47} "A law is also impermissibly vague when it 'delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.'" Id. at 383–384, 618 N.E.2d 138, quoting *Grayned v. Rockford* (1972), 408 U.S. 104, 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222. Like the ordinance in *Rowland,* A.M.O. 941.06(h) gives police and courts unfettered discretion to determine whether a person's conduct constitutes criminal loitering. "When a legislative body enacts a law that fails to provide minimal guidelines, it has in effect authorized police officers, prosecutors, judges, and jurors to limit another's freedoms according to their own personal prejudices and predilections * * *; it has authorized rule by whim rather than law." Id., quoting *Timmons v. Montgomery* (M.D.Ala.1987), 658 F.Supp. 1086, 1089.

{¶ 48} We also determine that A.M.O. 941.06(h) permits police to make an arrest before any crime has occurred. They do not need to have any evidence that a crime has occurred or is about to occur; rather, they can make a subjective determination to arrest a person based solely on their suspicion of criminal intent. "The fact that conduct occurs in a 'high crime area' does not eliminate the requirement that law enforcement must have probable cause to arrest a person. Law enforcement personnel cannot rely on their own 'zero tolerance' policy to arrest people for pretextual loitering law violations in high crime areas for the purpose of conducting a fishing expedition for evidence of other crimes." *Griffin,* 133 Ohio App.3d at 495, 728 N.E.2d 1097. In this case, such a subjective intent formed the basis for appellant's arrest. Specifically, the officer testified on cross examination, as follows:

{¶ 49} "Q [Defense Counsel]: Okay. What do you understand to be the meaning of the word, 'loitering'?

{¶ 50} "A [Lieutenant Morris]: Loitering, to me, to engage in activity other than the purpose of it, is a.

{¶ 51} "Q: Okay. And the purpose to come in the restroom is what?

{¶ 52} "A: To use the restroom.

{¶ 53} "Q: Did he use the restroom?

{¶ 54} "A: Yes, Sir, he did.

{¶ 55} "Q: Okay. And there was no unusual delay in him leaving the restroom was there?

{¶ 56} "A: No.

{¶ 57} "Q: And the reason he may have delayed leaving the restroom is because you were in a conversation with him, correct?

{¶ 58} "A: As he was leaving, he actually struck up conversation again with me.

{¶ 59} "Q: And it's not against the law to strike up a conversation?

{¶ 60} "A: Absolutely not.

{¶ 61} "Q: Nor is it against the law to be in the park?

{¶ 62} "A: Nope.

{¶ 63} "Q: Or to use the public restroom in the park?

{¶ 64} "A: Correct.

{¶ 65} "Q: Or to drive around the island in the park before you park?

{¶ 66} "A: Correct.

{¶ 67} "Q: So he hasn't done anything illegal other than your decision that he loitered in and about the toilet area?

{¶ 68} "A: Correct.

{¶ 69} " * * *

{¶ 70} "Q: Okay. Did we arrest everyone that visited the restroom?

{¶ 71} "A: No, absolutely not.

{¶ 72} "Q: Cause I was—I was kind of wondering what the criteria was to not get arrested if you entered the restroom. If I entered the restroom and talked to you, am I getting arrested because I loitered?

{¶ 73} "A: No.

{¶ 74} "Q: Okay, then why did he get arrested because he loitered?

{¶ 75} "A: From the onset when we first made contact, the nod was just a social nod. The slowing down and pumping of the brakes is a protocol that— there's actually a website. We were informed of this by Canton PD who had an investigation and a problem in their parks and they told us to go to this site because specifically Butler Rodman was listed. And in that protocol was the tapping of the brakes, the backing in with your parking lights on during the daytime. Several different indicators of * * *

{¶ 76} "Q: Okay. And all that protocol does nothing more than call your attention to someone, right?

{¶ 77} "A: Correct.

{¶ 78} "Q: Okay. But it's not a cause to arrest him?

{¶ 79} "A: That's right.

{¶ 80} "Q: Okay.

{¶ 81} " * * *

{¶ 82} "Q: The protocol you're talking about, that we have no knowledge of anyone other than apparently the police is that when somebody nods at you, happens to pump their brakes, and backs their car in with their lights on, that means that * * *

{¶ 83} "A: The protocol * * *

{¶ 84} "Q: * * * that they want to have sex with you?

{¶ 85} "A: The protocol that I'm referring to is, is it's public information. It's on the website. It's a site called cruisingforsex.com. It's very crude and it's, it's not a gay site. It can be either. But the point is that they loiter. They're called 'Cruisee Parks,' 'Cruisee Spots,' 'Cruisee Adult Bookstores.' Butler Rodman Park is rated four star. It's on the site and it has the protocol. I didn't write the protocol. People who patronize these places write the protocol.

{¶ 86} "Q: But apparently, you've read all of them.

{¶ 87} "A: One at a time, they are not illegal. The totality of the circumstances leads me to believe that that's why your client was there.

{¶ 88} "Q: Okay, But the totality of the circumstances are that still all those things put together aren't illegal.

{¶ 89} "A: Correct.

{¶ 90} " * * *

{¶ 91} "A: As I'm standing there and he's walking out unobstructed, he made a comment to me. 'So what's going on?' I believe is what he said, or words to the effect of, 'So what's going on?'

{¶ 92} "Q: Anything wrong with that?

{¶ 93} "A: Absolutely not.

{¶ 94} "Q: Okay. And from there the conversation talks about getting together, you know, not a conversation uncommon at a baseball field as 6:00 o'clock at night between a man and a woman, right?

{¶ 95} "A: I'm sorry.

{¶ 96} "Q: Okay. If I was out watching my kid play baseball at Butler Rodman Park at 6:00 o'clock at night.

{¶ 97} "A: Uh-huh.

{¶ 98} "Q: And I'm talking to a single mother, and I'm a single male and I say, 'Hey, let's get together.' There's no crime committed there, is there?

{¶ 99} "A: Correct.

{¶ 100} "Q: Okay, so there's no crime committed there when he may have said to you, 'Let's get together sometime.' Right?

{¶ 101} "A: And I asked, 'Do you want to get together in a restroom or in the woods.' * * *

{¶ 102} "And he said, 'It's too risky.' "

{¶ 103} On redirect, the prosecutor asked Lieutenant Morris to clarify what he believed the definition of loiter was, and Lieutenant Morris responded, "I go to the park and we go, maybe for a picnic. I coach softball. We play ball there. Our purpose is to go there for a park activity, to play, to play ball, to run, to walk a dog. I don't go to Butler Rodman or Memorial or Silver Park solely to use the restroom. There's another purpose."

{¶ 104} The prosecutor clarified, stating, "Okay. So you're saying that it's because the purpose was not to use the park, it was to do something else," to which Lieutenant Morris responded, "Correct."

{¶ 105} On recross, defense counsel asked Lieutenant Morris:

{¶ 106} "Q: But all this purpose stuff is your perception. I mean people do use the park restrooms.

{¶ 107} "A: Correct.

{¶ 108} " * * *

{¶ 109} "Q: Okay. And you know, I don't want to bore the jury with my bathroom experiences, but you know, when we travel we frequently stop at parks and use the bathrooms because they're generally clean. Okay. At our national parks or wherever, you know. I think that it is, it's—you won't disagree with me that it's perfectly legal to use the park's restroom.

{¶ 110} "A: I agree.

{¶ 111} "Q: Okay. And that the purpose for him going in the restroom is to use the restroom, then he fulfilled the purpose.

{¶ 112} "A: Correct.

{¶ 113} "Q: He actually did go to the bathroom. We can hear it on the video.

{¶ 114} "A: Yes.

{¶ 115} "Q: Okay. And let's assume the worst possible case scenario that he was there for exactly the purpose you think he was there for. Okay. He didn't commit a crime. Right? His discussion with you was not criminal.

{¶ 116} "A:  The discussion was not criminal, no.

{¶ 117} "Q:  Okay.  So, and you didn't charge him with a criminal activity with regard to solicitation or sex?

{¶ 118} "A:  That's correct.

{¶ 119} "Q:  Okay.  So now I guess we're just looking at the time frame that he was there.  Did he fulfil his purpose?  Yes, he went to the bathroom.  And he was there for somewhat less than two minutes.  I mean there's a number of reasons, would you agree, when someone parks their car that they may not immediately get out of the car.  Maybe they have a cell phone call.  Maybe they're looking at some paperwork.  Maybe there's a song on the radio they like to listen to.  So since you're not there, since you're twenty, thirty feet away, forty feet away, whatever it was, you don't know why he didn't get out of the car.  You're just speculating.  Correct?

{¶ 120} "A:  The entire incident was about five minutes.  And do I know that he was listening to a radio, cell phone?  I don't know that.

{¶ 121} "Q:  You don't know.  Right?  So you can't say for sure why he didn't immediately hop out of his car and run holding himself to the restroom to go to the bathroom, right?

{¶ 122} "A:  Correct.

{¶ 123} "Q:  Okay.  And again, the nod as explained by you, he could have just been courteous.

{¶ 124} "A:  Sure.

{¶ 125} "Q:  He could have known you.  You could've lived down the street from him at some point.  And he could have nodded at you cause he recognized you.  You know, there's times when people pump their brakes.  Maybe he didn't want to go in the restroom if you were in there.  Maybe when he saw you start to pull away, he stopped and wanted to come back.  Who knows?  But did you ever inquire of him why he pumped his brakes?

{¶ 126} "A:  No.

{¶ 127} "Q:  No.  You just assumed it was a signal to meet me in the bathroom, buddy?  Right?  Cause that's what your protocol told you to do?

{¶ 128} "A:  It was an indicator, yes.

{¶ 129} "Q:  In your opinion.

{¶ 130} "A:  In my opinion."

{¶ 131} Lieutenant Morris's testimony focused only on his subjective conclusions that appellant had loitered in or near the toilet area based on a two-minute conversation after appellant used the toilet facilities to urinate.

{¶ 132} The plain language of A.M.O. 941.06(h) does not give police or courts an objective standard to enforce this law, and this vagueness led to arbitrary enforcement.

{¶ 133} Accordingly, we hold that the ordinance is unconstitutionally vague.

## II. OVERBREADTH

{¶ 134} Appellant next contends that A.M.O. 941.06(h) is overbroad. Specifically, Appellant argues that the prohibition against loitering encompasses a wide range of constitutionally protected activity, "specifically the Freedom to Associate and Freedom of Speech" and that "there are no limitations within the statute to explain what constitutes loitering in or near a toilet building."

{¶ 135} In general, "[a]n overbreadth challenge is predicated on the proposition that '[a] clear and precise enactment may nevertheless be "overbroad" if in its reach it prohibits constitutionally protected conduct.'" *Akron v. Molyneaux* (2001), 144 Ohio App.3d 421, 426, 760 N.E.2d 461, quoting *Grayned*, 408 U.S. at 114–115, 92 S.Ct. 2294, 33 L.Ed.2d 222. In considering an overbreadth challenge, a court must determine "whether the ordinance sweeps within its prohibitions what may not be punished under the First and Fourteenth Amendments." *Rowland*, 67 Ohio St.3d at 386, 618 N.E.2d 138, quoting *Grayned* at 115, 92 S.Ct. 2294, 33 L.Ed.2d 222.

{¶ 136} In order to demonstrate facial overbreadth, a party challenging a law must show "that its potential application reaches a significant amount of protected activity." *Rowland*, 67 Ohio St.3d at 386, 618 N.E.2d 138. Moreover, even if a criminal statute has a legitimate application, it can still be held facially invalid if it makes a substantial amount of lawfully protected conduct unlawful. Id.

{¶ 137} A.M.O. 941.06(h) can readily implicate "a person's status, associates, mere presence or otherwise innocent behavior." Id. Therefore, the ordinance encroaches on a "substantial amount of constitutionally protected conduct." (Citations omitted). Id. "The case law is legion that people cannot be punished because of their status, the company they keep, or their presence in a public place." Id., citing, e.g., *Roberts v. United States Jaycees* (1984), 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (freedom of association); *Brown v. Texas* (1979), 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (arrest cannot be based on "suspicion" alone); *Papachristou*, 405 U.S. at 169, 92 S.Ct. 839, 31 L.Ed.2d 110

("Arresting a person on suspicion, like arresting a person for investigation, is foreign to our system, even when the arrest is for past criminality"); *Robinson v. California* (1962), 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 ("status" of narcotic addiction cannot be made criminal); *Natl. Assn. for the Advancement of Colored People v. Alabama* (1958), 357 U.S. 449, 460–461, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (freedom of association). "People are also absolutely free to walk or run away from the police unless they are in custody." Id., citing *Terry v. Ohio* (1968), 392 U.S. 1, 32–33, 88 S.Ct. 1868, 20 L.Ed.2d 889, 44 O.O.2d 383 (Harlan, J., concurring) ("ordinarily the person addressed has an equal right to ignore his interrogator and walk away"). "In our jurisprudence guilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity * * *, that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause * * *." Id., quoting *Scales v. United States* (1961), 367 U.S. 203, 224–225, 81 S.Ct. 1469, 6 L.Ed.2d 782.

{¶ 138} *Rowland* referenced a Richmond, Virginia ordinance that prohibited loitering for purposes of prostitution. The Richmond court had stated:

{¶ 139} "Under the provisions of the Richmond ordinance, a person once convicted of prostitution could be arrested and convicted for window-shopping. A hitchhiker could be arrested and convicted because she waved and beckoned to cars though she said not a word regarding solicitation or prostitution. The ordinance may force people to curb their freedom of expression and association or risk arrest. Even if the hitchhiker or former prostitute were acquitted due to lack of evidence of intent, an arrest would be justified under the statute, and the arrest itself chills first amendment rights." (Citation omitted.) *Coleman v. Richmond* (1988), 5 Va.App. 459, 465, 364 S.E.2d 239.

{¶ 140} Additionally, in *Silvar v. Nevada* (2006), 122 Nev. 289, 129 P.3d 682, a Nevada court struck down a loitering ordinance as overbroad. The ordinance stated:

{¶ 141} "It is unlawful for any person to loiter in or near any public place or thoroughfare in a manner and under circumstances manifesting the purpose of inducing, enticing, soliciting for or procuring another to commit an act of prostitution.

{¶ 142} "Among the circumstances which may be considered in determining whether such purpose is manifested are that such person repeatedly beckons to, stops, attempts to stop or engages persons passing by in conversation, or repeatedly stops or attempts to stop motor vehicle operators by hailing, waving of arms or any other bodily gesture. No arrest shall be made for a violation of this section unless the arresting officer first affords such person an opportunity to

explain such conduct, and no one shall be convicted of violating this section if it appears at trial that the explanation given was true and disclosed a lawful purpose." *Silvar*, 129 P.3d at 684.

{¶ 143} The court, in striking down the law as being overbroad, held that the ordinance criminalized constitutionally protected conduct. "Because CCO 12.08.030 chills [ ] conduct, the ordinance is substantially overbroad in relation to its 'legitimate sweep.' The ordinance's provision for an opportunity to explain one's conduct does not mitigate this chilling effect. Second, the ordinance contains no specific intent element; therefore, it cannot make constitutionally protected conduct criminal." *Silvar*, 129 P.3d at 688.

{¶ 144} Similarly, A.M.O. 941.06(h) chills First Amendment rights, as it sweeps within the prohibitions of the law many things that may not be constitutionally punished under the First and Fourteenth Amendments. This ordinance prevents citizens from enjoying their complete constitutional rights and deprives ordinary citizens of their rights to exercise speech, association, and privacy based on their presence or innocent behavior in a public place.

{¶ 145} In summary, we hold that A.M.O. 941.06(h) contravenes both the federal and Ohio due process clauses because it is unconstitutionally vague and overbroad. Appellant's first and second assignments of error are sustained.

### III

{¶ 146} In his third assignment of error, appellant challenges his conviction, claiming that it is against the manifest weight of the evidence. Due to our disposition of appellant's first and second assignments of error, the third assignment of error is moot, and we decline to address it. App.R. 12(A)(1)(c).

{¶ 147} For the foregoing reasons, the judgment of the trial court is reversed, and appellant's conviction is vacated.

Judgment reversed
and conviction vacated.

.

HOFFMAN, P.J. and EDWARDS, J. concur.